PRELIMINARY INJUNCTION
MARK BUTTERFIELD, Chief Judge.
INTRODUCTION
Plaintiff brought this case on June 30, 1999 alleging elder abuse by her grandson, J.T.M. and requesting a Temporary Restraining Order [TRO] keeping him at a safe distance from her and requesting that he be removed from her home. The Court granted a TRO on June 30, 1999 after an ex parte hearing in which Ms. Mike’s attorney called a TAU worker to substantiate the reasons for a TRO. The Court called an elder, Dennis Funmaker to establish that it had subject matter jurisdiction under the customs and traditions of the Ho-Chunk Nation. All parties to this case are members of the Ho-Chunk Nation.
Notice was then given to the defendants of the TRO and the time set for a hearing in this matter. The hearing was held on July 9, 1999. At the conclusion of the hearing, the Court granted the Preliminary Injunction and stated that it would be reduced to writing.
Due to a death in the family of the presiding judge the written order was delayed. The Court now memorializes its decision of July 9, 1999.
APPLICABLE LAW
The Ho-Chunk Nation lacks an elder abuse statute. Therefore, the Court took testimony from elder Dennis Funmaker of the Bear Clan on the custom of “respect for elders.” According to Mr. Funmaker, respect for elders is considered a type of law. It is one of the more important customs of the Tribe. This is due to several factors. The elders have fostered us, our knowledge of customs come from their knowledge of the past and what has been passed down. The elders have taken care of us from before. They are to be respected for this and held in a place of honor. It is the duty of the younger generation to take care of the elders. Elders are always served first at tribal events and are served by their younger relatives. They are given special care in seating and their disabilities are accommodated whenever possible.
The punishment for mistreatment of an elder under custom varied from banish *188 ment from the village to having the Bear Clan, the “warukos” of the village, take away or destroy the property of the person who abused the elder.
HCN CONSTITITION
PREAMBLE
We the People, pursuant to our inherent sovereignty, in order to form a more perfect government, secure our 'rights, ad-ranee the general welfare, safeguard our interests, sustain our culture, 'promote our traditions and perpetuate our existence, and secure the natural and self-evident right to govern ourselves, do ordain and establish this Constitution for the Ho-Chunk Nation.
HCN Const. Art. I,
Section 1. Territory. The territory of the Ho-Chunk Nation shall include all lands held by the Nation or the People, or by the United States for the benefit of the Nation or the People, and any additional lands acquired by the Nation or by the United States for the benefit of the Nation or the people, including but not limited to air, water, surface, subsurface, natural resources and any interest therein, notwithstanding the issuance of any patent or right-of-way in fee or otherwise, by the governments of the United States or the Ho-Chunk Nation, existing or in the future.
SErrioN 2. Jurisdiction, The jurisdiction of the Ho-Chunk Nation shall extend to all territory set forth in Section 1 of this Article and to any and all persons or activities therein, based upon the inherent sovereign authority of the Nation and the People or upon Federal law.
HCN Const. Art. VII,
Section 5. Jurisdiction of the Judiciary.
(a) The Trial Court shall have original jurisdiction over all cases and controversies, both criminal and civil, in law or in equity, arising under the Constitution, laws, customs and traditions of the Ho-Chunk Nation, including cases in which the Ho-Chunk Nation, or its officials and employees, shall be a party. Any such case or controversy arising within the jurisdiction of the Ho-Chunk Nation shall be filed in Trial Court before it is filed in any other court. This grant of jurisdiction by the General Council shall not be construed to be a waiver of the Nation’s sovereign immunity.
Section 6. Po wers of the Trial Cou rt.
(a) The Trial Court shall have the power to make findings of fact and conclusions of law. The Trial Court shall have the power to issue all remedies in law and in equity including injunctive and declaratory relief and all writs including attachment and mandamus.
FACTS
1. Pauline B. (Winneshiek) Mike is an elder member of the Ho-Chunk Nation. She is in her early eighties and is frail. She is a member of one of the upper or sky clans.
2. Loylee B. Mike is Pauline’s daughter. She is employed at Rainbow Casino in the maintenance department and works during the day shift.
3. J.T.M. is Loylee’s 12 year old son who resides with her in Pauline Mike’s home near Nekoosa, WI.
4. All three Mike’s lived together prior to June 30, 1999 in a house built by Ho-Chunk Housing for Pauline B. Mike.
5. Pauline B. Mike was diagnosed with cancer three years ago which is presently in remission and is unable to take care of herself. Two years ago, she had Loylee and her grandson J.T.M. moved in to look after her and take care of things she could not do for herself.
*189 6. Pauline B Mike testified that J.T.M. caused a great deal of damage to her newly constructed two year old home. She identified 15 pictures that were taken from her home showing stains on the carpet and damage to the walls and fixtures inflicted by J.T.M. Two rottweilers were kept by J.T.M. at the home and allowed full access to ran loose in the house.[1] Ms. Mike testified that many of the carpet stains were due to dog feces and urination from the two rottweilers that was neither controlled by her daughter Loylee and/or her grandson J.T.M., nor cleaned up.
7. The home w7as a two year old structure built for Ms. Mike by the Tribe. The testimony and pictures showed a house that was filthy, unkempt and unsanitary. There were holes punched in the sheet rock, fixtures damaged, doorknobs and hardware missing and damaged. This was in contrast to Pauline Mike’s previous habits of tidiness and cleanliness testified to by her other daughter Ernestine Mike Helgeson.
8. J.T.M. put Pauline in fear by acts of violence. He broke her son’s truck windshield, and made holes in the wall with a large knife that was put into evidence. Pauline also testified that J.T.M. damaged a porch, broke windows in it and that it is unusable as a storage site.
9. J.T.M. got into fights with a sister who occasionally visited and “hollered” at her in Pauline’s house. The displays of temper and violence during the fights intimidated and threatened Pauline B. Mike.
10. J.T.M. refused to respond to any requests made of him by Pauline and generally acted deaf around her. This is contrary to custom in which older children and teenagers are expected to listen and obey the reasonable requests of their elders. Though Pauline spoke to him with kindness J.T.M. either ignored her or refused to obey.
11. Pauline testified credibly that she was afraid of her grandson. Her daughter Loylee wouldn’t listen to her and J.T.M. bossed her daughter Loylee around. J.T.M. took tools from Pauline’s bedroom where he was prohibited to go. Pauline testified that an electric drill, a hand drill, four sizes of pliers, files and screwdrivers were missing from her room.
12. Geraldine Swan, a TAU worker fluent in Ho-Chunk, was asked to investigate an allegation of elder abuse by Sid Lewis, the Executive Director of Social Services. Ms. Swan visited Pauline Mike when the grandson was present. Ms. Swan is a Community Elder Representative who normally works in Area I, the Black River Falls area, but was asked to visit Pauline Mike in the Wisconsin Rapids area because of her fluency in Ho-Chunk. There were two large rottweiler dogs present that were allowed out during her visit. The dogs were about 80 lbs and stood nearly desk high. J.T.M. came out to restrain the dogs when she pulled up. During Ms. Swan’s visit she saw the house was a mess and the carpet smelled of dog urine and feces.
13. Ms. Swan interviewed Pauline in Ho-Chunk which J.T.M. does not understand. Pauline explained that she feared J.T.M. and did not wish him to live there anymore because of the fear he caused her. During the interview J.T.M. came down and sat at the table where the interview was taking place and glared at Ms. Swan attempting to intimidate her. Ms. Swan stated she also feared J.T.M. Based *190 on her prior knowledge of Pauline’s house, during the visit it was a mess. Geraldine described Pauline’s previous house as being spic and span.
14. Pauline kept her door to her bedroom locked for fear of J.T.M. One night she awoke to find him in her room unannounced and without permission. It frightened her that she could not keep him out of her bedroom.
15. Ernestine Mike is another daughter of Pauline B. Mike’s and an aunt of J.T.M. She testified that two years ago J.T.M. physically resisted his mother Loy-lee’s attempt to put a seatbelt on him at the Wisconsin Rapids Wal-Mart. His behavior was combative, yelling and defiant. J.T.M. threatened to report Ernestine for child abuse if she continued to help her sister get him belted in. In general, Ernestine testified that J.T.M. had worn down his mother Loylee and that she did not control him. She believed that the constant strain of having to pick up after J.T.M. and his mother and be his babysitter was detrimental to Pauline’s physical and mental health.
16. There was no testimony that J.T.M. actually hit Pauline Mike or otherwise caused her physical harm. However, his destructive behavior to the house, with the dogs, shouting and fighting with his sister, disobedience to his mother and in general out-of-control behavior while living in the house gave Pauline Mike a reasonable and justifiable fear that he could harm her. This created an atmosphere of intimidation and fear which was corroborated by several witnesses including Pauline Mike, Ernestine Helgeson, and Geraldine Swan.
,16. Mr. Ken Ninham, a mental health counselor for the HCN Dept. Of Social Services Mental Health office testified that he had seen J.T.M. in 1995 until he left the Wisconsin Rapids office in 1996. Mr. Nin-ham had J.T.M. evaluated by Dr. Andrews when he worked in Wisconsin Rapids. He has recently returned to serving the Wisconsin Rapids area of the Ho-Chunk Nation. He stated, based on Dr. Andrews report and his exposure to J.T.M., that J.T.M. suffered from hyperactivity, depression, an adjustment disorder and also exhibited signs of abuse. He had worked with J.T.M. for a year and a half and presently recommended that J.T.M. be seen on an in-patient basis. He specifically stated that J.T.M. had problems with anger and differentiating between what was real and what was not, i.e. he had problems identifying reality.
17. Mr. Ninham stated that he had left recommendations for follow-up with J.T.M. with the mental health worker who was to replace him in Wisconsin Rapids in 1996. He identified that worker as Helene Lincoln. He did not know if these recommendations were followed.
18. Mr. Ninham recently saw Loylee Mike in April 28, 1999 and July 7, 1999. Ms. Mike disclosed that she was unable to control J.T.M. and wished assistance in sending him to a boarding school such as Flandreau or Wahpeton in South Dakota.
DECISION
This case is unique in that it is brought under the customary law of the Ho-Chunk Nation and not pursuant to a Legislative Act. All the parties to the case are either members or employees of the HoChunk Nation. The acts of abuse occurred in a house built for an elder of the Ho-Chunk Nation which was only two years old. Based on these facts the Court finds that it has personal and subject matter jurisdiction over the parties.
Ms. Pauline B. Mike is an elder of some 80 years who belongs to a respected family. She has a right under tradition and custom to live in her own home without *191 fear and feeling intimidated by a minor grandson. She has a right to live in clean and sanitary conditions.
The Court further finds that the plaintiff has met its burden of showing that Pauline B. Mike has a reasonable fear of J.T.M. based on the damage he has inflicted on her home and yard. An elder in Ms. Mike’s position should expect that both her grandchildren and children should behave in a respectful manner by preserving and protecting her and her property. This has not been done by J.T.M. who has violated Ms. Mike’s zone of safety by causing damage to her home, to her son’s truck parked near the house by smashing its windshield, and by stealing items from her room. Ms. Mike cannot feel safe even in her locked bedroom due to the fact J.T.M. has figured how to circumvent the lock and has entered her room without permission.
Ms. Mike has also met its burden of showing that Loylee Mike has failed to restrain and control J.T.M. in a manner which would protect her mother from fear and intimidation by this 12 year old boy. It has further been shown that Loylee Mike has failed to mitigate the damage caused by J.T.M. by cleaning the carpet of dog feces and urine, fixing the holes in the walls, repairing and/or replacing the damaged fixtures and otherwise keeping Ms. Pauline B. Mike’s home in a fit, safe and sanitary condition fit for an elder of the Ho-Chunk Nation. Ms. Mike admitted through Lisa Harrison that she was unable to control J.T.M. and has sought the assistance of the HCN Dept, of Social Services for his treatment and/or placement in a boarding school to give him a structured environment. This recognition is a step in the journey to wellness for this troubled family.
ORDER
The Court therefore orders that J.T.M. and Loylee Mike be removed from Pauline B. Mike’s residence in the Wisconsin Rapids area and that they are prohibited from living in the home for a period of six months. The Court also orders the removal of the dogs and that the owner be notified of their removal.
It is further ordered that J.T.M. be prohibited from approaching within 100 feet of Pauline B. Mike on any land under the jurisdiction of the Ho-Chunk Nation except in the company of an adult other than Loylee Mike, who is able and willing to control and protect Ms. Pauline B. Mike from any threats and/or intimidation by J.T.M. There shall be no visitation by and between Pauline B. Mike and J.T.M, except by her initiation and the visitation be supervised by an adult other than Loylee Mike. If such visitation is to occur it may only do so outside the home of Pauline B. Mike
The Court further orders that J.T.M. may not return to the home of Pauline B. Mike after six months except with her permission and after he has successfully undergone a mental health assessment and treatment for the conditions which are diagnosed. The HCN Dept, of Social Services is ordered to coordinate services with the applicable County agency and file a status report on whether said services are to be provided to J.T.M. in the near future. The Status Report is to be filed within 60 days of July 7, 1999.
The Court further orders that J.T.M. and Loylee Mike must attend counseling before the HCN Traditional Court prior to being allowed to return to the Pauline B. Mike home.
Loylee Mike may continue to visit her mother’s home with her permission.
The Court retains jurisdiction over this case for one year to insure the conditions set forth are met.
*192 IT IS SO ORDERED this June 14, 2007 nunc pro tunc to the date of the hearing July 9, 1999, from within the sovereign lands of the Ho-Chunk Nation.

. The rottweilers apparently were owned by an absent male relative, who is a truck driver in California at the time of the hearing.